[987 NE2d 276, 964 NYS2d 499]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant-Respondent, v GERARD IPPOLITO, Also Known as GERALD IPPOLITO, Respondent-Appellant.

Argued February 6, 2013; decided April 2, 2013

**POINTS OF COUNSEL**

*Sandra Doorley, District Attorney*, Rochester (*Geoffrey A. Kaeuper* and *Leslie E. Swift* of counsel), for appellant-respondent. A reversal is required to reinstate defendant's

criminal possession of a forged instrument convictions which were supported by legally sufficient evidence that the subject checks were forged when they misrepresented the true identity of the ostensible maker by using the victim's unauthorized signature and also concealing the power of attorney relationship. (*People v Clyde*, 18 NY3d 145; *People v Bleakley*, 69 NY2d 490; *People v Cabey*, 85 NY2d 417; *People v Contes*, 60 NY2d 620; *People v Foster*, 64 NY2d 1144, 474 US 857; *People v Malizia*, 62 NY2d 755; *People v Hines*, 97 NY2d 56; *People v Franov*, 17 NY3d 58; *People v Shanley*, 196 NY 574; *Matter of Ferrara*, 7 NY3d 244.)

*Timothy P. Donaher, Public Defender*, Rochester (*James Eckert* of counsel), for respondent-appellant. I. The Appellate Division properly dismissed those counts convicting Mr. Ippolito of criminal possession of a forged instrument where he possessed an unlimited power of attorney from the complainant, signed her name, then possessed those instruments. The People's only argument in opposition to the defense's trial order of dismissal motion—that it was "customary" to add the letters "POA" to such a signature—was an inadequate basis upon which to affix criminal liability to the performance of acts which were expressly authorized by that power of attorney. (*People v Miller*, 70 NY2d 903; *People v Contes*, 60 NY2d 620; *Burton v PNC Bank, N.A.*, 12 AD3d 264; *People v Ditta*, 52 NY2d 657; *People v P.J. Video*, 68 NY2d 296; *People v Cannarozzo*, 62 AD2d 503; *People v Shanley*, 132 App Div 821; *People v Cunningham*, 2 NY3d 593; *People v Cullen*, 50 NY2d 168; *People v Williams*, 84 NY2d 925.) II. The trial court committed reversible error by answering a juror question from the jury box, without giving Mr. Ippolito an opportunity to give input into the answer before the answer was provided to the jury, after indicating that it was fully aware that it was following an improper procedure. (*People v O'Rama*, 78 NY2d 270; *People v Bonaparte*, 78 NY2d 26; *People v Malloy*, 55 NY2d 296; *People v Torres*, 227 AD2d 242; *People v Agosto*, 73 NY2d 963; *People v Lykes*, 81 NY2d 767; *People v Damiano*, 87 NY2d 477; *People v Kisoon*, 8 NY3d 129; *People v Cook*, 85 NY2d 928; *People v Collins*, 99 NY2d 14.)

#### OPINION OF THE COURT

READ, J.

At some point in 2003, Katherine M. L., who was in her mid-80s, was steered to defendant Gerard Ippolito, an accountant, to help her deal with delinquent property taxes on her Rochester residence. On June 27th of that year, she executed a statutory

short-form durable general power of attorney (the POA), which granted Ippolito unlimited powers to act in her "NAME, PLACE AND STEAD in any way which [she herself] could do, if [she] were personally present . . . to the extent that [she was] permitted by law to act through an agent" with respect to a long list of subjects, including "real estate transactions," "banking transactions," "tax matters," and "all other matters." The POA was recorded at the Monroe County Clerk's Office on July 9, 2003.

Shortly after securing the POA, Ippolito set up a business checking account at HSBC Bank denominated "Eastside Professional Services[1] Special Escrow Account for Katherine M. [L.]," under his sole control, into which he funneled Katherine M. L.'s income from Social Security, a pension, and payments from two trusts. By the time Katherine M. L. revoked the POA on July 28, 2006, Ippolito had allegedly stolen at least $696,000 from her. Additionally, he did not pay all required federal and state taxes on Katherine M. L.'s income while he was managing her affairs, which resulted in a tax liability of roughly $500,000. Ippolito was accused of carrying out his thefts principally by making out checks to Katherine M. L. or obtaining bank checks made out to her from the HSBC account, endorsing these checks in her name, and depositing the proceeds into accounts he maintained at another bank. Ippolito did not indicate on the checks that he, rather than Katherine M. L., was the actual signer of her name.

The grand jury handed down a 46-count indictment charging Ippolito with one count of second-degree grand larceny, a class C felony (Penal Law § 155.40 [1] [the value of the property alleged to have been stolen exceeds $50,000]), and 45 counts of second-degree criminal possession of a forged instrument (CPFI), a class D felony (Penal Law § 170.25), 42 of which related to the checks that he endorsed in Katherine M. L.'s name, and three of which involved other instruments (a certificate of incorporation and two specific powers of attorney). At Ippolito's jury trial in September 2007, the People presented evidence that the customary practice when signing a principal's name pursuant to a power of attorney was for the agent to sign his own name as well, along with the letters "POA"; they argued that Ippolito defrauded the bank by neglecting to do this. At the close of the People's case and again at the close of proof, Ippolito's

---

**1.** "Eastside Professional Services" was the corporate name of Ippolito's business.

attorney unsuccessfully sought a trial order of dismissal. He maintained that because the POA vested Ippolito with the legal right to sign Katherine M. L.'s name on the checks, his act in doing so was not forgery.

Just as the judge began to charge the jury, the following exchange occurred:

"TRIAL JUROR: Can I ask a question?

"THE COURT: You're not supposed to, but go ahead.

"TRIAL JUROR: I just want to know if we would have a copy of the law in the room.

"THE COURT: Good question. The answer to that is no. I'll read it to you as many times as you request, but you cannot get a copy to go back there."

The jury found Ippolito guilty on all counts of the indictment save two: count 16, which related to a check Ippolito endorsed by signing both "Eastside Prof Services Escrow Acct" and Katherine M. L.'s name; and count 27, which related to a check he endorsed by signing his own name in addition to Katherine M. L.'s. On October 31, 2007, the judge sentenced Ippolito as a second felony offender to 14½ to 29 years in prison, and ordered him to pay $696,595.14 in restitution.

On appeal, Ippolito made three arguments: that the proof was legally insufficient to support his convictions of the 40 check-related crimes; that the judge committed reversible error by answering the juror's question without consulting the parties; and that the judge was required to hold a hearing with respect to the amount of restitution. By decision dated November 10, 2011, the Appellate Division, with one Justice dissenting, reversed Ippolito's 40 check-related CPFI convictions and dismissed those counts of the indictment;[2] vacated the amount of restitution ordered and remitted for a hearing to determine the proper sum; and otherwise affirmed (89 AD3d 1369 [4th Dept 2011]).

The court concluded that the evidence was not legally sufficient to convict Ippolito of the 40 check-related crimes because

---

2. Because of the way in which the judge directed the sentences to run, dismissal of these 40 counts did not alter the minimum or maximum term of the indeterminate sentence imposed on Ippolito.

"the ostensible maker of the checks, i.e., the victim, authorized the actual maker of the checks, i.e., defendant, to make the checks, 'which purport[ ] to be [the] authentic creation[s]' of the victim. Thus, it cannot be said that the checks in question were falsely made, although 'recitals in the instrument may be false' or defendant may have exceeded the scope of authority delegated to him by the victim" (*id.* at 1369-1370 [citations omitted]).

Citing Penal Law § 60.27 (2), the court further ruled that the judge was required to conduct a hearing to determine the amount of restitution upon Ippolito's request and "irrespective of the level of evidence in the record" (*id.* at 1370 [internal quotation marks omitted]); and considered the alleged error in responding to the juror's question to be unpreserved and, in any event, meritless.

The dissenting Justice disagreed only with the majority's reversal of the 40 check-related CPFI convictions. In his view, the checks were forgeries because Katherine M. L. testified that she did not "give [Ippolito] permission" to sign her name on the individual checks, which "bore no indication that [he] was acting in a representative capacity or under the authority of a power of attorney"; and the jury "obviously concluded" as a factual matter "that [Ippolito] did not act under the [POA]— regardless of any authority that it may have conferred upon him" (*id.* at 1370-1371 [Carni, J., dissenting]).

The dissenting Justice granted the People's motion for leave to appeal (18 NY3d 929 [2012]);[3] thereafter, a Judge of this Court granted Ippolito permission to appeal as well (18 NY3d 925 [2012]). We now affirm.

## I.

A person is guilty of second-degree CPFI "when, with knowledge that it is forged and with intent to defraud, deceive or injure another, he utters or possesses any forged instrument" (Penal Law § 170.25); and a written instrument, such as a check, is "forged" when "falsely made, completed or altered" (Penal Law § 170.00 [7]). A "falsely made" written instrument "purports to be an authentic creation of its ostensible maker or drawer, but . . . is not such either because the ostensible maker or drawer is fictitious or *because, if real, he did not authorize*

---

**3.** On this appeal, the People do not contest the Appellate Division's ruling that a hearing must be conducted to determine the amount of restitution.

*the making or drawing thereof"* (Penal Law § 170.00 [4] [emphasis added]).

The People assert that "[e]ach time [Ippolito] signed [Katherine M. L.'s] name, without indicating the POA relationship, and offered the check, he presented an instrument which purported to be what it was not, the personal act of [Katherine M. L.]." They liken this case (as did the dissent below) to *People v Shanley* (132 App Div 821 [1st Dept 1909], *affd on op below* 196 NY 574 [1909]), stating that in both instances "an agent sign[ed] the principal's name without any POA notation thereby offering a false instrument as being the personal act and signature of the principal, and in turn obtaining proceeds to benefit himself."

In *Shanley*, the defendant, an attorney, was convicted of first-degree forgery (former Penal Law § 884)[4] in signing and uttering as true an instrument satisfying a mortgage on which he admittedly signed the name of his client, Miss Julia A. Smith, and to which an acknowledgment was annexed. He received $25,000 in discharge of the mortgage, and spent it for his own purposes. When the fraud was discovered, the defendant fled the state. He subsequently surrendered under an agreement that he would not be indicted for grand larceny.

According to the trial testimony of the commissioner of deeds, who took the acknowledgment, the defendant introduced him to "a lady, Miss Smith" (*id.* at 823). Although the commissioner

---

4. Former section 884 provided, as relevant to *Shanley*, that

"[a] person [was] guilty of forgery in the first degree who with intent to defraud, forges:

"1. A will or codicil of real or personal property, or the attestation thereof, or a deed or other instrument, being or purporting to be the act of another, by which any right or interest in property is or purports to be transferred, conveyed, or in any way charged or affected; or,

"2. A certificate of the acknowledgment or proof of a will, codicil, deed, or other instrument, which by law may be recorded or given in evidence when duly proved or acknowledged, made or purporting to have been made by a court or officer duly authorized to make such a certificate[.]"

Former Penal Law § 880, in turn, defined

"[t]he expressions 'forge,' 'forged[,]' and 'forging,' as used in [article 84 (Forgery)], [to] include false making, counterfeiting and the alteration, erasure, or obliteration of a genuine instrument, in whole or in part, the false making or counterfeiting of the signature, of a party or witness, and the placing or connecting together with intent to defraud different parts of several genuine instruments."

"had never met that woman before," and she did not sign the satisfaction piece in his presence, "she acknowledged it" (*id.* at 823-824). He added that this "Miss Julia A. Smith" was not the same person as the Miss Julia A. Smith whom he later met at the district attorney's office, and who was present in the courtroom. The defendant disputed this. He testified that he reached Miss Smith on the telephone and asked her to tell the commissioner, who was in his office at the time, that it was "all right" for him to have signed her name on the mortgage satisfaction; and that after speaking with Miss Smith over the telephone, the commissioner certified that she had executed this document (*id.* at 823). Miss Smith denied that any such conversation took place.

As the Appellate Division recounted, the defendant

> "having admitted that he signed the name Julia A. Smith to the satisfaction of the mortgage, and having attempted to justify the acknowledgment by his story of a telephonic acknowledgment to [the commissioner, then sought] to justify this transaction upon the ground that he was acting under a power of attorney" (*id.* at 824).

Miss Smith had indeed given the defendant a power of attorney, which he contended was sufficiently broad so as to permit him to sign her name to the satisfaction of mortgage and to procure the acknowledgment.

The court explained that

> "[w]hatever authority may have been conferred by that power of attorney[,] it certainly did not authorize the execution and acknowledgment of the instrument set up in the indictment. That instrument, upon its face, was a forgery; *upon its face it purported to bear the signature of Julia A. Smith, and that she had personally acknowledged it before the commissioner of deeds*. As it is conceded that she did not sign it, and as the evidence establishes that she did not appear personally before the commissioner of deeds and acknowledge the same, the People established in the first instance that it was a forged instrument. The burden of explanation then fell upon the defendant, who undertook to explain *dehors* the instrument that it had been executed by authority, and, therefore, he was not guilty of forgery" (*id.* at 829 [emphasis added]).

The Appellate Division, in affirming Shanley's conviction, considered his agency defense unavailing because

> "as [a] matter of law . . . [the] power of attorney was not authority for the execution and delivery of the satisfaction of the mortgage and the acknowledgment thereto . . . . The whole instrument was a forgery; it purported to be what it was not, viz., *the personal act of Julia A. Smith in both signing and appearing personally before the commissioner of deeds and acknowledging her signature*" (*id.* at 830 [emphasis added]).

Although the People characterize *Shanley* as a "critical Court of Appeals case" that is "right on point both factually and legally," this is simply not so. *Shanley* is factually very different from this case, involving, as it does, the execution of an acknowledgment falsely verifying that Miss Smith personally signed the satisfaction of mortgage. Additionally, there was some dispute as to the scope of the power of attorney, which is not the situation here. And further, when *Shanley* was decided New York's Penal Law did not define "false making," whereas the revised Penal Law, adopted in 1965, clarifies that this term does not encompass documents whose making or drawing is authorized (*see* Penal Law § 170.00 [4]).

Finally, no matter what, if any, potency *Shanley* may retain as precedent, it does not, as the People claim, endorse the proposition that a written instrument is falsely made any time an agent signs the principal's name without indicating the principal-agent relationship. Precedent predating 1909 held that

> "while it is the preferable way for an agent in executing any instrument in the name of the principal to add his own name as agent, so that the instrument may show by what person the signature was written, *still in law the writing of the name of the principal alone is sufficient*" (*Youngs v Perry*, 42 App Div 247, 248 [2d Dept 1899] [emphasis added]; *see also* 1 Williston on Contracts § 296 at 564 [1920] ["(T)hough it is desirable for the agent to indicate that the principal's name has been signed by the agent, and not by the principal personally, it is legally a sufficient execution to bind the principal if the agent, without disclosing in the body of the instrument or in the signature that the principal

was not acting personally signs the name of the principal"]; *id.* at 564 n 73 [commenting that the rule stated in *Wood v Goodridge* (60 Mass 117 [1850]), "that it should appear on the face of the instrument that it was executed by an agent and by virtue of authority delegated to him, cannot be supported"]).

In 2008, though, the legislature amended the General Obligations Law to mandate that agents engaging in a transaction where a handwritten signature is required must sign in a way that discloses the principal-agent relationship (*see* L 2008, ch 644; General Obligations Law § 5-1507 [1] [a]; *see also* General Obligations Law § 5-1507 [1] [b] [third parties do not incur any liability for accepting a handwritten signature that does not conform to the statutory requirements]).

 Here, the POA (until revoked) vested Ippolito with unlimited power to sign Katherine M. L.'s name on written instruments. As a result, the checks cannot have been forgeries (*see People v Cannarozzo*, 62 AD2d 503, 504 [4th Dept 1978, Simons, J.], *affd* 48 NY2d 687 [1979] ["(A) person does not 'falsely make' an instrument when he is authorized to execute it"]). Put another way, where the ostensible maker or drawer of a written instrument is a real person, a signature is not forged unless unauthorized (*see* Penal Law § 170.00 [4]). Since Ippolito was empowered to sign Katherine M. L.'s name at the times when he drew or endorsed the 40 checks at issue on this appeal, the People's proof was legally insufficient to convict him of CPFI.

## II.

 Ippolito disputes his convictions for grand larceny and the three non-check-related counts of CPFI on the ground that the trial judge committed reversible error when he answered a juror's question without first soliciting comments from the parties. As related earlier, just as the judge began to charge the jury a juror spoke up, asking whether jurors "would have a copy of the law" in the jury room, and the judge immediately answered that he would not permit this. Counsel must be afforded an opportunity to suggest a meaningful response to any jury question arising during deliberations (*see People v O'Rama*, 78 NY2d 270 [1991]; *see also* CPL 310.30 [a deliberating jury may request additional information or instruction "with respect

to any . . . matter pertinent to (its) consideration of the case
. . . (and) the court . . . after notice to both the people and
counsel for the defendant . . . must give such requested infor-
mation or instruction as (it) deems proper"]). Whether or not
section 310.30, as interpreted in *O'Rama*, applies in this situa-
tion, where a juror voices a question in open court before
deliberations begin, Ippolito's attorney was required to make a
timely objection. He was present when the question was asked
and answered, yet failed to object at that time, when the judge
could have easily cured the claimed error (*see People v Ramirez*,
15 NY3d 824, 826 [2010]).

Accordingly, the order of the Appellate Division should be af-
firmed.

Chief Judge Lippman and Judges Graffeo, Smith and Pigott
concur; Judge Rivera taking no part.

Order affirmed.